1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

# DISTRICT OF NEVADA

9
10   UNITED STATES OF AMERICA,

11          Plaintiff,                          Case No. 3:73-cv-183-LDG
                                                Case No. D-183-LDG
12   v.
                                                Sub-File 3:73-cv-201-LDG
13   ALPINE LAND & RESERVOIR CO., *et*
     *al.*,                                     **ORDER**
14
            Defendants.
15
16   In Re: Nevada State Engineer Ruling
     No. 5759
17
18
19          In Ruling No. 5759, issued August 14, 2007, the Nevada State Engineer approved

20   three applications to change the place, but not the manner, of use of certain water rights to

21   an area known as the Carson Lake and Pasture.  Prior to the change application, the

22   manner of use for the water was irrigation.  Remarking that the proposed use of the water

23   when applied to the Carson Lake and Pasture "for the provision of food and habitat for

24   migratory wildlife," could "be described as irrigation," the State Engineer held that the

25   change application did not request a change in manner of use.  The petitioners, the

26   Pyramid Lake Paiute Tribe and the United States of America, argue that this conclusion

1   was erroneous as the proposed manner of use of the water was for wildlife purposes

2   which, as defined by Nev. Rev. Stat. §533.023, includes "the establishment and

3   maintenance of wetlands."

4

5              Jurisdiction to Hear the Tribe's and the United States' Petitions

6              In a related petition, the Tribe invoked this Court's reserved jurisdiction under the

7   *Alpine Decree* to appeal a decision of the State Engineer awarding non-decreed water

8   rights.  The Ninth Circuit stated, in that related petition, that "subject matter jurisdiction

9   exists over the Tribe's appeal from the State Engineer's Ruling 5823 only insofar as the

10  allocation of Dayton Valley Hydrographic Basin groundwater rights is plausibly alleged to

11  affect adversely the Tribe's decreed water rights under the *Orr Ditch Decree*."  *United*

12  *States v. Alpine Land & Reservoir Co.*, 385 Fed. Appx. 770 (9ᵗʰ Cir. 2010).  In light of the

13  Ninth Circuit's language limiting subject matter jurisdiction in that petition to the adverse

14  impact on the Tribe's *Orr Ditch* decreed water rights, the Court requested the parties to

15  brief the issue whether the Court has subject matter jurisdiction to review the Tribe's and

16  United States' petitions.

17             At the outset, the Court must note that the Court's specific concern is not whether it

18  has jurisdiction to hear appeals of certain decisions of the State Engineer.  Without

19  question, the Court has such jurisdiction.  In the *Alpine Decree*, the Court reserved

20  jurisdiction to review the State Engineer's decisions regarding applications to change the

21  place of diversion, the place of use or the manner of use of *Alpine Decree* water rights.

22  *Alpine Decree, Administrative Provision VII.*  The Court has similarly interpreted the *Orr*

23  *Ditch Decree* as reserving to this Court the jurisdiction to review the State Engineer's

24  decisions regarding application to change the place of diversion, the place of use or the

25  manner of use of *Orr Ditch Decree* water rights.  The Ninth Circuit has further recognized,

26  in petitions for review filed by the Tribe in both the *Alpine* and *Orr Ditch* litigations, that this

2

1  Court's jurisdiction extends to permit judicial review of decisions of the State Engineer

2  regarding non-decreed water rights when the impact of such decisions can be "plausibly

3  alleged to affect adversely the Tribe's decreed water rights under the *Orr Ditch Decree*."  *Id*,

4  385 Fed. Appx. 770; *United States v. Orr Water Ditch Co.*, 600 F.3d 1152, 1160 (9th Cir.

5  2010).  The Court's jurisdiction to review these types of decisions of the State Engineer

6  does not, however, establish that this Court has jurisdiction to hear such an appeal when

7  brought by a person who lacks standing.

8          As summarized by the Supreme Court:

9              The federal courts are under an independent obligation to examine
            their own jurisdiction, and standing 'is perhaps the most important of [the
10          jurisdictional] doctrines.'"  *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-231,
            110 S.Ct. 596, 607-608, 107 L.Ed.2d 603 (1990) (citations omitted).
11
               It is by now well settled that "the irreducible constitutional minimum of
12          standing contains three elements.  First, the plaintiff must have suffered an
            'injury in fact'–an invasion of a legally protected interest that is (a) concrete
13          and particularized, and (b) actual or imminent, not conjectural or hypothetical.
            Second, there must be a causal connection between the injury and the
14          conduct complained of....  Third, it must be likely, as opposed to merely
            speculative, that the injury will be redressed by a favorable decision."  *Lujan*
15          *v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 2136, 2137,
            119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotation marks
16          omitted); see also, *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315,
            3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans*
17          *United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct.
            752, 758, 70 L.Ed.2d 700 (1982).  In light of these principles, we have
18          repeatedly refused to recognize a generalized grievance against allegedly
            illegal governmental conduct as sufficient for standing to invoke the federal
19          judicial power.  *See, e.g., Valley Forge Christian College, supra*; *Schlesinger
            v. Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41
20          L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct.
            2940, 41 L.Ed.2d 678 (1974); *Ex parte Lévitt*, 302 U.S. 633, 58 S.Ct. 1, 82
21          L.Ed. 493 (1937) (*per curiam*). We have also made clear that "it is the burden
            of the 'party who seeks the exercise of jurisdiction in his favor,' *McNutt v.*
22          *General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80
            L.Ed. 1135 (1936), 'clearly to allege facts demonstrating that he is a proper
23          party to invoke judicial resolution of the dispute.'  *Warth v. Seldin*, 422 U.S.
            490, 518, [95 S.Ct. 2197, 2215, 45 L.Ed.2d 343] (1975)."  *FW/PBS, supra*, at
24          231, 110 S.Ct., at 607-608.

25  *United States v. Hays*, 515 U.S. 737, 742-743 (1995).

26

1          The State Engineer argues that "requiring a showing of a plausible allegation of

2    injury in addition to the standards of NRS 533.450(1) to invoke the jurisdiction of this Court

3    is inconsistent with the plain language of the *Alpine Decree* and NRS 533.450(1), and

4    could lead to the anomalous outcome that no court would have jurisdiction over a decision

5    of the State Engineer on a decreed water right."  The Court disagrees.  At a minimum, the

6    Ninth Circuit has expressly recognized that when the State Engineer's decision concerns a

7    non-decreed water right, this Court's jurisdiction to review that decision can only be invoked

8    by a petitioner who can plausibly allege injury to a water right decreed by this Court.

9    *Alpine*, 385 Fed. Appx. 770, *Orr Ditch*, 600 F.3d at 1160.  Thus, such a plausible allegation

10   of injury is not merely consistent with, but is required by, the *Alpine Decree* and NRS

11   533.450(1) in at least that circumstance.  Further, requiring a plausible allegation of injury

12   does not lead to the anomalous outcome that no court will have jurisdiction over a decision

13   of the State Engineer on a decreed water right.  A determination that this Court cannot hear

14   the appeal of a person who lacks standing does not lead to the conclusion that no court,

15   including this Court, has jurisdiction to hear the appeal brought by a person with standing.

16         Relying upon the second sentence of Administrative Provision VII, the Tribe

17   suggests that the only standing or interest required by the *Alpine Decree* to appeal a State

18   Engineer's ruling on a change application is that a person feel himself aggrieved.  The

19   argument is without merit for several reasons.  First, Administrative Provision VII also

20   requires that the notice of appeal contain a statement of the manner in which the State

21   Engineer's decision "injuriously affects the appellant's interests."  Thus, the *Alpine Decree*

22   itself requires that the notice contain a plausible allegation of injury, suggesting that the

23   *Decree* itself requires that a party appealing a decision must be able to plausibly allege an

24   injury to its interests.  Second, the jurisdiction of this Court to review the decisions of the

25   State Engineer is not established solely by the four corners of the *Alpine Decree*.  Rather,

26   as an Article III court, this Court's jurisdiction must also comport with the constitutional

1   minimum for standing.  Third, the Ninth Circuit's decision in the appeal of State Engineer's

2   Ruling 5823 expressly requires that the Tribe plausibly allege an adverse impact to its *Orr*

3   *Ditch* decreed water rights to invoke this Court's subject matter jurisdiction.  Finally,

4   applying the Tribe's argument at face value leads to the unsound conclusion that this Court

5   must hear and decide the merits of appeals brought by persons whose interest in the

6   decisions of the State Engineer lack any connection whatsoever to either the *Alpine* or *Orr*

7   *Ditch Decrees*, or the water rights decreed by this Court.  Under the Tribe's proposal, a

8   former employee holding an irrational grudge against a change applicant who fired him

9   many years ago could bring an appeal because he could, quite plausibly, feel himself

10  aggrieved merely because the State Engineer ruled in favor of his former employer.  The

11  Court cannot agree that standing to appeal arises from nothing more than a feeling of

12  grievance, regardless of whether that feeling results from antipathy toward a former

13  employer or is caused by an adverse impact on a legally protected interest.  While

14  Administrative Provision VII suggests that any person feeling aggrieved may appeal a

15  decision of the State Engineer, the constitutional requirements of standing limit this Court's

16  jurisdiction to hear only those appeals brought by persons seeking to vindicate a legally

17  protected interest that is adversely impacted by the decision of the State Engineer.

18      As pointed out by the Tribe, this Court and the Ninth Circuit have, for many years,

19  considered and decided the Tribe's appeals of change applications of *Alpine Decree* water

20  rights that the Tribe has protested.  The Ninth Circuit, however, has expressly considered

21  the question whether the Tribe has standing to appeal a State Engineer's decision

22  concerning an *Alpine Decree* water right in only a single opinion: *United States v. Alpine,*

23  887 F.2d 207 (9th Cir. 1989) (*Alpine II*).  The *Alpine II* litigation involved the classification of

24  farms as "bench" or "bottom," which classification would affect the water duty.  As relevant

25  to the instant matter, the Ninth Circuit noted: "The district court's final order held that the

26  Tribe would not have standing in any future dispute over land classification submitted to the

1  Watermaster because '[a] change of classification for a single farm unit will have an

2  insignificant and legally non-existent effect on the rights of the Paiute Tribe."  The Ninth

3  Circuit reversed, reasoning:

> The district court, however, proceeded on the assumption that the Tribe
> would not be adversely affected by the decision as to any particular farm
> because the incremental effect of changing an individual classification is
> minimal.  The problem is that the total effect on the <u>Tribe's water rights</u> is
> ultimately the sum of the individual parts.

7  *Alpine II,* 887 F.2d at 214.

8  This language confirms that the Tribe must plausibly allege that it is adversely affected by a

9  decision to have standing to appeal.  Further, this language from *Alpine II* establishes that,

10  though the incremental adverse effect of a specific decision may be minimal, the *de*

11  *minimus* nature of the adverse impact does not preclude a determination that the Tribe has

12  standing to appeal, particularly where the Tribe must participate in each decision to avoid a

13  cumulative or aggregate adverse impact that is significant.

14        *Alpine II*, however, does not address the standing issue that is of concern to this

15  Court.  In the *Ruling 5823* litigation, the Ninth Circuit limited this Court's jurisdiction, and

16  thus the Tribe's standing, to an injury to the Tribe's *Orr Ditch* <u>decreed</u> water rights.  The

17  language employed in *Alpine II* suggests that the Ninth Circuit either assumed or had

18  concluded that the cumulative impact of individual land classifications could have a

19  significant impact on the "Tribe's water rights."  The Ninth Circuit expressly rested its

20  reasoning on "the total effect on the <u>Tribe's water rights</u>."  The Tribe's present petition,

21  however, does not allege an injury to its *Orr Ditch* decreed water rights.  Rather, the Tribe

22  has alleged that the State Engineer's decision allows the applicants "to receive water to

23  which they are not legally entitled, and thereby diminish the waters of the Carson River

24  available to the Newlands Project, and therefore increase the flow of the Truckee River

25  diverted to the Newlands Project and away from the lower Truckee River and Pyramid

26  Lake."  Further, in response to the Court's request for briefing, the Tribe has not argued

6

1   that the State Engineer's decision will have any impact on its *Orr Ditch* decreed water

2   rights.  The Tribe does not contest that its *Orr Ditch Decree* water rights were awarded in

3   Claims 1 and 2.  The Tribe also does not contest that, consistent with the *Orr Ditch Decree*,

4   water can only be diverted from the Truckee River to the Newlands Project pursuant to

5   Claim 3.  The Tribe also does not contest that its Claims 1 and 2 water rights are senior to

6   Claim 3.  As such, the Tribe receives its entire water duty under Claims 1 and 2 before any

7   water is diverted to the Newlands Project.  In short, even when considered in the

8   cumulative and aggregate, the State Engineer's decision that water applied to the Carson

9   Lake and Pasture is irrigation cannot, as a matter of law, adversely affect the Tribe's *Orr*

10  *Ditch Decree* water rights.  The Tribe's present challenge does not allege an injury to its

11  *Orr Ditch Decree* water rights, but alleges the State Engineer's decision will diminish water

12  for which the Tribe lacks any rights under the *Orr Ditch Decree*.

13          Nevertheless, both *Alpine II* and *Pyramid Lake Piaute Tribe v. Morton*, 354 F.Supp.

14  252 (D.D.C. 1972) recognize that the Tribe has a protected legal interest to ensure that any

15  water that is not obligated to be diverted from the Truckee River is not diverted, but is

16  instead permitted to continue flowing in the Truckee River to Pyramid Lake.  The Pyramid

17  Lake Indian Reservation includes Pyramid Lake, the land surrounding it, the lower reaches

18  of the Truckee River, and the bottom land alongside the lower Truckee.  As summarized by

19  Justice Brennan in a footnote to his concurrence in *Nevada v. United States*, 463 U.S. 110

20  (1983):

21              I also note that the District Court found that one of the purposes for
            establishment of the Pyramid Lake Reservation was "to provide the Indians
22          with access to Pyramid Lake . . . in order that they might obtain their
            sustenance, at least in part, from these historic fisheries."   App. to Pet. for
23          Cert. in No. 81-2245, at 183a.   As a consequence, the Tribe retains a
            *Winters* right, at least in theory, to water to maintain the fishery, a right which
24          today's ruling does not question.   To some extent it may be possible to
            satisfy the Tribe's claims consistent with the *Orr Ditch* decree--for instance,
25          through judicious management of the Derby Dam and Lahontan Reservoir,
            improvement of the quality of the Newlands Project irrigation works,
26          application of heretofore unappropriated floodwaters, or invocation of the

7

<u>decree's provisions for restricting diversions in excess of those allowed by the decree.</u>

(Emphasis added).  Thus, while the Tribe has a right to divert water pursuant to Claims 1 and 2 of the *Orr Ditch Decree*, the Tribe has a further protected legal interest that arises from its *Winters* right to water to maintain a fishery.  Further, as water can be diverted from the Truckee River for the Newlands Reclamation project only pursuant to Claim 3 of the *Orr Ditch Decree*, the Tribe can invoke "the decree's provisions for restricting diversions in excess of those allowed by the decree."  Those provisions include this Court's reserved jurisdiction to hear appeals of the State Engineer's decisions regarding change applications for decreed water rights.  While the Tribe must allege an injury to maintain standing, that injury need not necessarily adversely impact the Tribe's Claim 1 and 2 rights so long as the injury is plausibly alleged to be caused by a State Engineer's decision regarding a decreed water right.  Accordingly, the Court has jurisdiction to hear the Tribe's appeal.

The Court also has jurisdiction to hear the United States' petition.  The United States has obligations created by federal regulation, including the Newlands Project Operating Criteria and Procedures and the Endangered Species Act, to restrict the diversion of Truckee Water under Claim 3 to only that amount permitted by decree.  *See Morton*, 354 F.Supp. at 256 ("In order to fulfill his fiduciary duty [to the Tribe], the Secretary [of the Interior] must ensure, to the extent of his power, that all [Truckee River] water not obligated by court decree or contract with the [Truckee-Carson Irrigation] District goes to Pyramid Lake.")

<u>Whether the State Engineer Erred in Finding Proposed Manner of Use is Irrigation</u>

Whether the manner of use of the water at the new location is for irrigation or is for wildlife purposes is critical because "[c]hange of manner of use applications from use for irrigation to any other purpose shall be allowed only for the net consumptive use of the

8

1   water right as determined by [the Alpine] Decree." *Alpine Decree*, Administrative Provision

2   VII, as amended by Order Entered September 29, 1986, Docket #688.  The total water duty

3   to irrigate bottom land farmlands is 3.5 acre-feet per acre, of which the "consumptive use of

4   irrigation water is 2.99 acre-feet per acre" for farmlands in the Newlands Project.  *United*

5   *States v. Alpine Land and Reservoir Co.*, 503 F.Supp. 877, 888 (D.Nev. 1980).  The

6   additional 0.51 acre-feet per acre of water (that is, the difference between the water duty of

7   3.5 acre-feet per acre and the consumptive use of 2.99 acre-feet per acre) is "[w]ater that

8   has been allowed in the duties for purposes of irrigation coverage."  As noted, this

9   coverage duty of 0.51 acre-feet per acre cannot be "changed to a consumptive use."  *Id.*, at

10  893.

11      The Nevada Waterfowl Association (NWA) filed Applications 71775 and 73574,

12  each of which sought to transfer both the consumptive use and non-consumptive use

13  portions of the underlying water rights to the Carson Lake and Pasture.  Finding that the

14  proposed manner of use was irrigation, the State Engineer approved the transfer of both

15  the 2.99 acre-feet per acre net consumptive use and the 0.51 acre-feet per acre non-

16  consumptive use portions of the respective water rights.

17      The Nevada Department of Wildlife (NDOW) filed Application 73444, seeking to

18  transfer only the non-consumptive use portion of the underlying water right to the Carson

19  Lake and Pasture, as the consumptive use portion of the water right was previously

20  transferred pursuant to Permit 60771.  Finding that the proposed manner of use was

21  irrigation, the State Engineer approved the application to transfer the 0.51 acre-feet per

22  acre non-consumptive use portion of the water duty.

23      As to each of the three applications, the State Engineer's decision permitting the

24  transfer of water exceeding the net consumptive use was correct only if the proposed

25  manner of use of the water at the Carson Lake and Pasture is irrigation.  If the proposed

26  manner of use is not irrigation, then the State Engineer's approval of the transfer of water

9

1    exceeding the net consumptive use acts to change use of the water from a non-

2    consumptive use to a consumptive use in violation of the *Alpine Decree*.

3         In his brief, the State Engineer asserts that "were these proposed changes being

4    pursued exclusively under the Nevada water code rather than the provisions of the *Alpine*

5    *Decree*, the question of whether their proposed use constitutes a change from irrigation

6    would not even be at issue."  The statement brings into focus that context is critical.  As

7    pointed out by the State Engineer, "the question under NRS 533.370(5) is whether a

8    proposed change will conflict with existing rights and not whether there has been a change

9    from irrigation to some other manner of use."  Equally correct, however, is the observation

10   that the question whether the proposed change will conflict with existing rights is not at

11   issue in determining whether the appropriate fee pursuant to §533.435 is for wildlife

12   purposes.  Whether the proposed change will conflict with existing rights is irrelevant to

13   determining both the appropriate fee under §533.435 and whether the proposed use is

14   irrigation under the *Alpine Decree*.  The context of the present petitions requires a

15   determination whether, under the *Alpine Decree*, the proposed use of the water will be a

16   change "from use for irrigation to any other purpose."

17        Though the context of this dispute is whether the proposed use of the water is an

18   irrigation use under the *Alpine Decree*, the State Engineer's decision gives scant

19   consideration to any aspect of the final *Alpine Decree*, including the Court's Findings of

20   Fact, Conclusions of Law, Administrative Provisions, and the opinion published at 503

21   F.Supp. 877 (D.Nev. 1980).  Indeed, the State Engineer referenced the language of the

22   *Alpine Decree* only once in his decision.  In that singular reference, the State Engineer

23   noted the *Alpine Decree's* discussion regarding whether the United States beneficially used

24   water on federally owned land in the Newlands Project.  The land was generally identified

25   as the Carson Pasture area and the Stillwater area.  In that discussion in the published

26   opinion, the *Alpine Decree* observed that "the amount of land actually irrigated varies

1  greatly from year to year depending on the available water."  Emphasizing the words

2  "actually irrigated," the State Engineer noted his prior finding that "it appears that the

3  decree court and the parties believed use of water on Carson Pasture and the Stillwater

4  areas was a form of irrigation."

5      Further context, however, is required to establish and properly understand the

6  relevance, to the present matter, of the *Alpine Decree's* observation that a greatly varying

7  amount of federally-owned land was "actually irrigated" by "drainage or seepage from

8  Project farms and very occasionally from direct flows."  That additional context includes the

9  *Alpine Decree's* recognition that the parties had stipulated that "the Carson Pasture and

10 other <u>pasture</u> lands within the project have an irrigation water right with a priority of July 2,

11 1902" (emphasis added).  Commenting on this stipulation, the *Alpine Decree* concluded

12 that it was a recognition of an historic condition "that the <u>pasture</u> lands are entitled to the

13 use of <u>whatever waters flow</u> from the lower portion of the Project vested right lands to the

14 exclusion of anyone who might seek to appropriate the waters for other uses."  Finally, as

15 the *Alpine Decree* ultimately concluded, the United States never beneficially used its water

16 rights for irrigation purposes on the pasture lands.  This additional context suggests that the

17 *Alpine Decree's* observation that the Carson Pasture was "actually irrigated" with drainage

18 water tends to suggest that the proposed use in the present matter is not irrigation.  Unlike

19 the present matter, the irrigation underlying the *Alpine Decree's* observation was

20 agricultural.  The drainage water applied to the land was for pasture lands, rather than

21 being applied to wetlands in the Carson Pasture area for the conservation, rehabilitation

22 and management of wildlife, its resources and its habitat.

23     The *Alpine Decree* references irrigation extensively.  As stated in the published

24 opinion, "one of the central tasks in this case is to establish a clear and specific water duty

25 for both the Newlands Project farmlands and the upper Carson farmlands."  The *Decree*

26 established that the water duty for these farmlands was that amount of water reasonably

1  necessary to grow alfalfa.  The decree court did not rely upon alfalfa because it was the

2  only crop grown on all the farmlands, but because it was the dominant cash crop

3  historically grown on the farmlands.  The *Alpine Decree* further recognized that "the water

4  duty is the amount of water required to properly irrigate the farmlands."  As the amount of

5  water necessary to properly irrigate a farm differed depending on the physical conditions of

6  the farm, including factors such as the steepness of the ground and the soil character, the

7  *Alpine Decree* awarded differing water duties to farmlands in different areas.  Farmlands on

8  the bottom lands of the Newlands Project were awarded a water duty of 3.5 acre-feet per

9  acre.  Farmlands on the bench lands of the Newlands Project were awarded a water duty

10 of 4.5 acre-feet per acre.  On both bottom land and bench land farms in the Newlands

11 Project, the court determined a net consumptive use of 2.99 acre-feet per acre.  The *Alpine*

12 *Decree* established differing water duties for farmlands on the upper Carson River above

13 the Lahontan region.  The net consumptive use on these farmlands above the Lahontan

14 region was set at 2.5 acre-feet per acre due to the cooler climate and shorter growing

15 season.  As recognized in the published decision, "one region slowly shades into the other

16 in the area between the reservoir and Carson City but for practical reasons the decree

17 treats Lahontan as the dividing line."  The non-consumptive water duty for irrigating

18 farmlands above the Lahontan region range from 2.0 to 6.5 acre-feet per acre.

19        As established in Finding of Fact IV of the *Alpine Decree*, 80,000 acres of cultivable

20 lands and 50,000 acres of pasture lands (and 7,500 acres in the Truckee Division) in the

21 Newlands Project were irrigated or susceptible of irrigation.   The United States withdrew

22 232,800 acres of land for the Newlands Project.  Irrigation of the cultivable lands and

23 pasture lands was necessary "to make these lands productive," as established in Finding of

24 Fact VIII.  As further establish in Finding of Fact VIII, various areas of the Carson River and

25 its tributaries require varying quantities of water "for proper irrigation and crop productivity."

26 Finding of Fact X recites the historic practices, customs, agreements and decrees followed

1  on the Carson River and its tributaries.  Within this Finding, numerous references are made

2  to specific irrigation practices.  Lacking from the Finding is any suggestion that these

3  irrigation practices concerned the application of water to land other than for maintaining

4  pastures or growing cash crops.

5        In Conclusion of Law II, the *Alpine Decree* awards water rights "for the irrigation of

6  their respective lands as described in the tabulation, for generating power, for municipal

7  purposes, for supplying the people living in the cities and towns, for reclamation of arid

8  lands, for watering livestock, for domestic uses and other beneficial purposes."

9        Administrative Provision I states: "Without the application of water, the lands

10  described above are dry and arid and irrigation is necessary for the production of valuable

11  crops thereon.  The respective amounts of water stated above to have been appropriated

12  for or used on these lands, are, in each instance, the maximum amount necessary and

13  sufficient for the reasonable and economical irrigation of crops thereon."

14        Taken as a whole, the *Alpine Decree's* references to irrigation establish that the only

15  irrigation use contemplated by the *Decree* was for agriculture, whether for productively

16  growing valuable cash crops or for pasture lands.  While the word "irrigation" can be

17  defined as any application of a liquid,[1] the *Alpine Decree* considered and referred to

18  irrigation use in the context of agriculture, and specifically to grow cash crops and pasture.

19  The decree court itself recognized that one of its central tasks was to establish a water duty

20  to irrigate farmlands.

21        The reasoning of the  *Alpine Decree* further guides the Court in limiting "irrigation

22  use" to irrigation for agricultural practices such as the growing of crops and pasture.  The

23  determinations made in the *Decree* do not rest upon the drawing of fine distinctions or

24  carefully-worded testimony, but upon practical considerations.  As noted in the published

25  

26        [1]        In a medical context, irrigation is the application of a liquid to a body part.

1   opinion in distinguishing the net consumptive use between the upper region and the

2   Lahontan region, though one region gradually shades into another, practical reasons

3   dictated the drawing of a line.  Regardless of the specific crop grown on a farm, the water

4   duty for all forms of irrigation was determined based upon the amount of water needed to

5   grow alfalfa.  Although the decree court expressly recognized that the water duty depended

6   on differing physical characteristics between farmlands, water duties were not established

7   on a farm-by-farm basis.  Rather, though differing soil conditions and other physical

8   characteristics slowly shade from farm to farm on the bottom lands of the Project, all

9   bottom land farms receive a water duty of 3.5 acre-feet per acre under the *Alpine Decree*.

10          At a practical and common-sense level, the best description of the proposed use of

11  the water is established by the State Engineer's finding "that the NDOW has the right to

12  develop, manage and administer the Carson Lake and Pasture area for the purposes of

13  conservation, rehabilitation and management of wildlife, its resources and habitat, and that

14  the Carson Lake and Pasture area is to be managed as a State Wildlife Management Area.

15  Management of the area contemplates the transfer of water to the area for wetlands

16  protection."  The NWA has an agreement with NDOW that allows the NWA's water rights to

17  be used in the management of the Carson Lake and Pasture.  This proposed use of the

18  water is for wildlife purposes.

19          Nevada has statutorily defined "wildlife purposes" to include "the watering of wildlife

20  and the establishment and maintenance of wetlands, fisheries and other wildlife habitats."

21  Nev. Rev. Stat. §533.023.  A straight-forward reading of this statute and of the State

22  Engineer's finding regarding the right of NDOW to develop and manage the Carson Lake

23  and Pasture permits only the conclusion that the NDOW must use the water for wildlife

24  purposes, including the maintenance of wetlands, rather than for the irrigation of farmlands.

25          As connoted by and used in the *Alpine Decree*, irrigation use refers to the

26  application of water to farmland for pasture or for the production of valuable crops (that is,

14

1   cash crops or agricultural crops such as alfalfa).  As established by §533.023, the watering

2   of wildlife and the establishment of wetlands and other wildlife habitats is a wildlife purpose.

3   The applicants' proposed use of the water is for wildlife purposes.  Accordingly, the Court

4   must reverse Ruling #5759.

5          In addition, even if the proposed use should be described as irrigation for purposes

6   of determining whether it constitutes a change of use under the *Alpine Decree*, the Court

7   would vacate Ruling #5759.  The *Alpine Decree* expressly drew a distinction between the

8   total water duty allowed for proper irrigation and the net consumptive use of the surface

9   water for that irrigation.  The *Decree* also expressly directed the State Engineer to permit a

10  change in use from irrigation to any other use only for the consumptive use amounts.  The

11  purpose of this directive was so that "water that has been allowed in the duties for

12  purposes of irrigation coverage could not then be changed to a consumptive use and

13  disappear from the return flows to other water right lands or the river."  The findings of the

14  State Engineer suggest that the physical characteristics of the wetlands and Carson Lake

15  and the express purpose of maintaining a wetland require a finding that all water applied

16  will be used consumptively.  Such a change from non-consumptive irrigation use to

17  consumptive irrigation use violates the *Alpine Decree*, even if the underlying use of the

18  consumptive use water duty is for irrigation.

19         Accordingly, for good cause shown,

20         THE Court **VACATES** State Engineer's Ruling #5759 to the extent that it finds and

21  concludes that Application Nos. 71775, 73574, and 73444 did not propose a change in

22  manner of use of the water rights decreed and awarded under the *Alpine Decree*.  The

23  existing manner of use for the *Alpine Decreed* water rights underlying Application Nos.

24  71775, 73574, and 73444 was irrigation.  Pursuant to the *Alpine Decree*, use of *Alpine*

25  *Decreed* water rights for irrigation is for the irrigation of cash crops and pasture on

26  farmlands.  The proposed manner of use for these water rights is for wildlife purposes on

15

1  wetlands.  The proposed manner of use for these *Alpine Decreed* water rights is not for

2  irrigation under the *Alpine Decree*.  The proposed manner of use is a change in manner of

3  use.

4         Pursuant to *Alpine Decree* Administrative Provision VII, the State Engineer could

5  approve the change application from irrigation to wildlife purposes for only the net

6  consumptive use water duty of 2.99 acre-feet per acre.  Therefore,

7         The Court **REVERSES** the State Engineer's grant of Application Nos. 71775 and

8  73574 to the extent it approved the transfer of the non-consumptive water duty of 0.51

9  acre-feet per acre.

10         The Court **REVERSES** the State Engineer's grant of Application No. 73444, which

11  requested to transfer only the non-consumptive use water duty of 0.51 acre-feet per acre.

12

13  DATED this ____//____ day of May, 2011.

14

15  _____
      Lloyd D. George

16        United States District Judge

17

18

19

20

21

22

23

24

25

26